**H. Erik BUTLER, Plaintiff,**

v.

**EMORY UNIVERSITY, Defendant.**

**Civil Action No. 1:13–cv–151–TCB.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed Sept. 19, 2014.

---

Patrick W. McKee, McKee & Mitchell, LLC, Newnan, GA, for Plaintiff.

Michael Wayne Johnston, Rebecca Cole Moore, King & Spalding LLP, Atlanta, GA, for Defendant.

### ORDER

TIMOTHY C. BATTEN, SR., District Judge.

H. Erik Butler was an untenured professor in Emory University's Department of German Studies. He claims that Emory unlawfully denied him tenure on the basis of his religion and his national origin, and in retaliation for prior complaints about discrimination.[1]

At Emory, tenure decisions are made with explicit consideration of, among other things, a professor's collegiality. And that is something that some of Butler's departmental colleagues thought he lacked. Over the course of several years, they painted the following picture of him: he made disparaging remarks about the department and other professors, including deriding a junior professor at a faculty

---

1. Butler also claims that the denial of tenure breached his employment agreement. Because the Court will remand this state-law claim, this order will not discuss it further.

meeting; he was outspoken and frank to the point of being detrimental to the department; he lacked diplomacy and tact; he was frequently angry and curmudgeonly; he was very difficult to talk to and work with; he alienated a significant number of professors in the department; he had a disengaged and dismissive attitude towards the department; he repeatedly expressed his low opinion of the department, for instance by sending emails to the department's interim chair accusing the department of bigotry, racism and chauvinism; and he accused the department's permanent chair of having a "fascist" management style.

Butler's tenure application was denied. Emory's provost, who ultimately made that decision, explained that Butler's lack of collegiality sunk his application. In this suit, Butler insists the real reason was either discrimination (because he is Jewish and American) or retaliation (because he had complained of discrimination in the German studies department).

Butler fails to meet his burden on summary judgment as to either claim. As to his discrimination claim, he has not established a prima facie case because he has not shown that Emory treated any similarly situated employee more favorably. And he has failed to create a jury question as to whether Emory's explanation for denying him tenure—that he lacked collegiality—is pretextual. And as to his retaliation claim, he has not shown that he engaged in any protected activity.

## I. Background

### A. Procedural History

Butler alleges that Emory violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Emory moved for summary judgment [61], and Magistrate Judge Linda T. Walker issued a Report and Recommendation [111]. She recommends granting Emory's motion, entering judgment in its favor on Butler's federal-law claims, and remanding his state-law claim.

Both parties object to the R & R [113, 114]. Butler says that Emory is not entitled to summary judgment. Emory agrees with Judge Walker insofar as she recommended granting summary judgment, but says that the Court should not remand Butler's state-law claim.

The seventy-four page R & R recounts the facts in detail and ably applies the law. The Court agrees with the R & R's conclusions in full, finds no merit in either party's objections, and will adopt the R & R as its order. Before doing so, the Court will briefly discuss the salient facts and address the parties' objections.

### B. Tenure at Emory

The tenure system at Emory works as follows. Assistant professors (like Butler) are untenured and receive one-year appointments. Each year their appointment may be renewed, and after their sixth year they are considered for tenure. The tenure decision is up-or-out: if an assistant professor does not receive tenure in his sixth year, he will not receive a renewed appointment for a seventh year. The decision is based on a professor's success and future promise in three criteria: teaching, research and service. Service includes "displaying a collegial spirit of cooperation and avoidance of disruptive behavior."

Assistant professors need not wait six years to learn whether they are meeting the tenure criteria; they are evaluated yearly by their department. And in year four, they undergo a more stringent, "pre-tenure" version of the yearly evaluation meant to give concrete feedback on their progress. The pre-tenure review is more formalized than the regular yearly reviews; the chair of the professor's depart-

ment writes a letter summarizing the department's evaluation of the professor and recommending whether the professor's appointment should be renewed for the following year. The pre-tenure review also includes a second layer of evaluation by the college's tenure and promotion committee. As discussed immediately below, that is the same committee that plays a part in the tenure decision.

After a professor's sixth year, the tenure decision is made. The process includes several steps.

*First,* the tenured members of the professor's department meet to consider whether to recommend tenure. After that meeting, the department's chair writes a detailed letter to the dean of the college explaining the department's recommendation. If the recommendation is not unanimous, the letter must record any dissenting opinions. Each member of the department who participates in the tenure meeting must either sign the chair's letter or write a separate letter with his or her own recommendation.

*Second,* if the department recommends tenure, the college's tenure and promotion committee reviews the department's letter and the supporting materials. That committee then makes a tenure recommendation, one way or the other, to the dean of the college.

*Third,* if the dean recommends tenure, everything created so far (the dean's recommendation, the tenure and promotion committee's recommendation, the department's letter(s), and any supporting materials) is forwarded through the provost to the president of the university.

*Fourth,* tenure is granted only if the president recommends it to the board of trustees and the board of trustees approves.

## C. Butler's Employment and Fourth- and Fifth-Year Reviews

In 2004 Emory hired Butler as an untenured assistant professor in its Department of German Studies.

In 2008 the department conducted its fourth-year, pre-tenure evaluation of Butler, after which Dr. Peter Höyng, the department chair, issued a written review. The review spoke favorably of Butler's performance in two of the three tenure criteria (teaching and research), but it raised serious concerns about the third criterion: his service. The review noted that while the department welcomed Butler's "manner of speaking frankly and forthrightly on issues related to the [d]epartment," the department was "distressed that his frankness and outspoken style veers in directions that can be detrimental to the spirit of the department."

In addition, Höyng separately noted that he had serious concerns about Butler's collegiality. Höyng justified his concerns with the following explanation: Butler had derided a junior colleague about her research and teaching during a formal department meeting; and Höyng felt that Butler lacked a long-term commitment to the department, lacked respect for the department, and had no interest in shaping the department's future in a productive and collaborative way. Höyng advised Butler to develop "diplomacy and tact" and to "transform his frequent attitude of a curmudgeon and [of] at times even anger into constructive criticism."

It was not just Höyng who believed that Butler lacked collegiality. Dr. Erdmann Waniek, a tenured member of the department, believed Butler had, as he described it, behavior problems. Waniek found it "very difficult to talk to" Butler because conversations would quickly become tense and contentious. Dr. James Melton, another tenured member of the department,

felt that Butler "needed to be more circumspect, more tactful and more careful" and that his behavior "was potentially damaging to him professionally." Ultimately, the department recommended that Butler's appointment be renewed. Höyng abstained from that decision.

Butler was also evaluated by the college's tenure and promotion committee as a part of his fourth-year review. That committee wrote that it did not have sufficient evidence to evaluate the collegiality issue, but it urged Butler "to work with his department to address the issue of collegiality, since [it] is a crucial criterion of service." The committee explained that if that criterion was not met, it would be "difficult [for Butler] to secure a rating of satisfactory at the time of the promotion [i.e., tenure] review."

In short, Butler's fourth-year departmental evaluation and Höyng's accompanying letter warned Butler of his collegiality problems. And the tenure and promotion committee's review made clear that because collegiality is a tenure criterion, if Butler expected to earn tenure he should begin remedying those problems within his department.

Butler understood this. He testified that he knew collegiality was an element of the tenure decision and that he understood he had been warned of collegiality problems that could negatively affect his chances for tenure.

Shortly after the pre-tenure evaluation, Höyng issued Butler's year-end faculty evaluation for that same year. Höyng continued on the collegiality theme, writing that Butler's "disparaging marks either on colleagues or the department as a whole make the professional exchange difficult [and] at times uneasy, especially when he mistakes critique for hostility." Höyng explained that he appreciated Butler's critical mind and would welcome such qualities if Butler expressed himself in a positive way that evidenced a desire to strengthen the department. After this year-end faculty evaluation, Butler met with Höyng. In that meeting, Butler expressed his anger with Höyng's opinion and accused Höyng of having a "fascist" style of chairing the department.

During Butler's fifth year, the leadership of the German studies department changed. Höyng was on sabbatical for that year, and Dr. Hiram Maxim served as the interim chair. Maxim issued Butler's fifth-year review. The fifth-year review did not reference any collegiality problems. As to the service criterion, the review noted only that Butler had carried out many administrative responsibilities and was "productive and professional" in doing so.

### D. The Tenure Decision

In 2010 Butler was considered for tenure. The department voted, 4–2, to recommend granting tenure. Höyng and Dr. Caroline Schaumann voted against. The department's letter recommending tenure explained Butler's collegiality problems. The Court will quote the relevant portion at length:

> When faculty discussed Dr. Butler's service record, the discussion centered on his collegiality, an issue that was raised in the context of the Fourth–Year Review when the Tenure and Promotion Committee wrote: "[ . . .] we would urge Dr. Butler to work with his department to address the issue of collegiality since this is a crucial criterion of service."

> Since the Fourth–Year Review, Dr. Butler has participated in several departmental matters in a constructive manner. [These matters are recounted.]

> This de facto constructive participation stands in an odd contrast to what a number of colleagues see as a disen-

gaged and often dismissive attitude toward the Department. For instance, he accused the Department of bigotry, chauvinism, and racism in e-mails to the Interim Chair [i.e., Maxim]. With the current Chair [i.e. Höyng], he does not engage in any communication.

He also expressed his low opinion of the Department on more than one occasion at departmental meetings, and some members were approached by several well-respected colleagues on campus and at national conferences who were dismayed by Dr. Butler's open disrespect for the Department. Through such remarks and actions, Dr. Butler has alienated a significant number of departmental colleagues, including non-voting faculty members, which, for a relatively small Department such as ours, has had a deeply unsettling effect. Recently for example, some female faculty members were offended by an office hour poster on his office door that students and faculty alike might find misogynistic. He removed the sign after a complaint by one of his colleagues. Regrettably, his behavior has made it very difficult for many of his colleagues to work with him.

In the second step of the tenure process, the college's tenure and promotion committee reviewed the tenure file and also made a positive tenure recommendation. In its letter to the dean of the college, the committee commented on the "remarks regarding Dr. Butler's collegiality from some of his colleagues in German Studies as reported in the Department's [tenure] Review letter and the Fourth–Year letter from the Tenure and Promotion Committee." The committee quoted the department's tenure letter to explain that some of Butler's colleagues "continue[d] to perceive a 'disengaged and often dismissive

attitude toward the Department.'" The committee concluded, however, that it did "not have an adequate basis for judging the degree of collegiality and collaboration of the candidate," so it ultimately voted unanimously to rate Butler's service record as satisfactory and to recommend granting tenure.

In the third step, the dean agreed and recommended to the provost that Butler be awarded tenure. The dean testified that he considered Butler's collegiality to be "a serious issue," but believed it was outweighed by the excellence of his scholarship.

The next step of the process was for the dean's positive recommendation to go through the university provost to its president and, finally, to the board of trustees. But the chain of positive recommendations stopped here. Dr. Earl Lewis, the provost, in consultation with the university's president, did not forward Butler's tenure application to the board. Lewis testified that he believed the tenure and promotion committee had not sufficiently addressed the collegiality issue and believed that it deserved further consideration. To that end, he set up a conference call with the tenured professors in the German studies department to discuss Butler's collegiality. Five of the department's six tenured professors participated in the conference call with Lewis.[2]

From the conference call, Lewis concluded that the professors agreed that Butler's collegiality was an issue, but that they disagreed over whether those problems should preclude an award of tenure. Of the professors who supported tenure, some believed that Butler's attitude would improve if he were granted tenure, and others believed that his lack of collegiality

---

**2.** Waniek was out of the country and did not participate in the call.

should not prevent him from receiving tenure.

Lewis disagreed with both views. He considered it likely that Butler's attitude would actually worsen if he received tenure. And he thought it unwise to grant tenure to a professor with collegiality problems who worked in a small department (the German studies department had only six tenured professor at the time). Finally, he considered it important that the younger members of the department, who would have to work with Butler the longest, were the ones opposing tenure. He ultimately did not recommend Butler for tenure. Emory's president approved this decision, and Butler's tenure application was denied. The university notified Butler of the decision on June 6, 2010.

Emory had no formal procedure for appealing tenure denials decided at the provost level, but it created one in this instance specifically for Butler. The newly created appeal process, like the pre-existing appeal processes at Emory, focused only on procedural errors and did not provide for substantive review of the decision. Butler appealed, and his appeal was denied. Under Emory's up-or-out system, Butler's appointment was not renewed, and his employment with Emory ended on July 31, 2011.

## II. Legal Standards

### A. Reviewing the Report and Recommendation

■ A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R & R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir.1982)).[3] This review may take different forms depending on whether the parties object to the R & R. A district judge must "make a de novo determination of those portions of the [R & R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). But portions of the R & R to which no objection is made need be reviewed only for clear error. *Macort v. Prem, Inc.*, 208 Fed.Appx. 781, 784 (11th Cir.2006).[4]

■ "Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Nettles*, 677 F.2d at 410 n. 8. "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

■ A district judge also has discretion to decline to consider arguments that were

---

**3.** The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir.1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n. 4 (11th Cir.2009) (discussing the continuing validity of *Nettles* ).

**4.** *Macort* dealt only with the standard of review to be applied to a magistrate's factual findings, but the Supreme Court has held that there is no reason for the district court to apply a different standard to a magistrate's legal conclusions. *Thomas v. Arn,* 474 U.S.

140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F.Supp.2d 1366, 1373–74 (N.D.Ga.2006) (collecting cases). This is to be contrasted with the standard of review on appeal, which distinguishes between the two. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir.1991) (when a magistrate's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

not raised before the magistrate judge. *Williams v. McNeil,* 557 F.3d 1287, 1292 (11th Cir.2009). A contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Id.* (quoting *United States v. Howell,* 231 F.3d 615, 622 (9th Cir.2000)).

After conducting a complete and careful review of the R & R, a district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams,* 681 F.2d at 732. A district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

### B. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.CIV.P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Investor Grp. v. FindWhat.com,* 658 F.3d 1282, 1307 (11th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party would have the burden of proof at trial, that party "must show *affirmatively* the absence of a genuine issue of material fact: it 'must support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial.'" *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1438 (11th Cir.1991) (quoting *Celotex,* 477 U.S. at 331, 106 S.Ct. 2548). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Celotex,* 477 U.S. at 331, 106 S.Ct. 2548).

### III. Discussion

#### A. Retaliation

 Title VII prohibits an employer from retaliating against an employee for opposing unlawful employment practices. 42 U.S.C. § 2000e–3(a); *see EEOC v. Total Sys. Servs., Inc.,* 221 F.3d 1171, 1174 (11th Cir.2000). The law's anti-retaliation provision protects an employee only if his opposition was based on a "good faith, reasonable belief" that his employer had engaged in unlawful discrimination. *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1351 (11th Cir.1999) (quoting *Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997)). In other words, to garner protection the employee must satisfy a two-pronged test: he must oppose activity that he subjectively (i.e., in "good faith," *id.*) believes was a violation of Title VII, and that belief must be objectively reasonable (even if not ultimately correct) by the standards of then-existing substantive law. *Id.* (citing *Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1388 n. 2 (11th Cir. 1998)).

Judge Walker concluded that Butler had not engaged in any protected opposition activity because he failed the second prong of this test—that is, any belief that Emory

violated Title VII was not objectively reasonable. The Court agrees. The crux is this: Butler may have complained about discrimination, but he had suffered no adverse employment action, so there was no Title VII violation to oppose.

Butler complained about racism and bigotry in the German studies department several times in the years leading up to his tenure denial. And he points to the department's tenure letter, which described him as lacking collegiality because he had "accused the Department of bigotry, chauvinism, and racism in e-mails to the Interim Chair." Butler argues this is evidence of retaliatory intent. In his view, he engaged in protected opposition by complaining about racism and bigotry, and the department faulted him for making such complaints. That, he says, is retaliation.

█ But none of Butler's complaints followed an adverse employment action. He merely complained generally, expressing his opinion that there was some form of nebulous background discrimination in the department. He identified no instance in which his employment was affected by discrimination. So even if his allegations were true, without an adverse employment action there could be no Title VII violation to oppose.[5] *See Howard v. Walgreen Co.,* 605 F.3d 1239, 1245 (11th Cir.2010) (citing *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir.2003)). And if Butler did not oppose a Title VII violation, he could

not have engaged in conduct that is protected by the anti-retaliation provision.

█ Butler suffered no adverse action before the tenure denial,[6] so his pre-denial complaints about discrimination could not have been protected opposition. *See id.* (holding that, where an employee complained of racism after his supervisor left him a message threatening his job, the employee had not engaged in protected opposition activity because leaving a threatening message did not amount to an adverse employment action). Simply stated: opposing discrimination in the air, as it were, is not protected activity. To be protected, an employee must oppose a violation of Title VII, and Title VII is violated only if the employee suffers an adverse action. *Id.*

Judge Walker made this very finding, and Butler does not dispute it. He spends pages of his objections pointing to instances in which he accused various individuals or the German studies department as a whole of racism, bigotry, or other discrimination. And he may well have done so. But he does not object to the magistrate judge's finding that he was subjected to no adverse employment action. Accordingly, that finding will be adopted by the Court. Accordingly, Butler has not shown he engaged in any protected activity; Emory is entitled to summary judgment on his retaliation claim.

5. If Emory created a hostile work environment, there could in theory have been a Title VII violation. But Butler does not argue this point or even raise it as a possibility, so the Court will not consider it.

6. Most of Butler's discrimination complaints followed his fourth-year, pre-tenure review. Although he doesn't say it, perhaps he believes that review was an adverse employment action that could support a Title VII violation.

But a negative performance review that does not lead to tangible job consequences (like lost pay or benefits or other concrete discipline) is not an adverse employment action. *See Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1241–42 (11th Cir.2001). In any case, the fourth-year evaluation was, on the whole, positive. It did criticize Butler for his lack of collegiality, but in the end it recommended *renewing* his one-year appointment.

## B. Discrimination

Title VII also makes it unlawful for employers to hire, fire or otherwise discriminate against their employees regarding "compensation, terms, conditions, or privileges of employment" on the basis of the employees' religion or national origin. 42 U.S.C. § 2000e–2(a)(1).

■ To succeed on his discrimination claims, Butler must prove that Emory intentionally discriminated against him on the basis of his religion or national origin. *Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1557 (11th Cir.1995). Intentional discrimination based on disparate treatment is a question of fact that may be established with direct or circumstantial evidence. *Underwood v. Perry Cnty. Comm'n*, 431 F.3d 788, 793 (11th Cir.2005). Because Butler relies on circumstantial evidence, analysis proceeds under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and their follow-on cases. Under that framework, the burden of production shifts back and forth between Butler and Emory, but the burden of persuasion always falls on Butler. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. That is, the ultimate question remains "whether [Butler] was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ Butler bears the initial burden of establishing a prima facie case of discrimination. *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir.1997). This is not an onerous burden; he must merely "establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.

1997). If he succeeds, then "a legal presumption of unlawful discrimination arises and the burden shifts to [Emory] to articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Evans*, 131 F.3d at 963. Its burden, however, is one of production rather than persuasion and is "exceedingly light." *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988). To meet its burden, Emory need only offer " 'a clear and reasonably specific' non-discriminatory basis" for its action. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 770 (11th Cir.2005) (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089).

■ If Emory meets its burden, "the presumption of discrimination created by the *McDonnell Douglas* framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.' " *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997) (quoting *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. 1089). At this point, Butler's burden under the *McDonnell Douglas* framework—rebutting the proffered nondiscriminatory reason—"merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. For purposes of summary judgment, "the question becomes whether the evidence, considered in the light most favorable to [Butler], yields the reasonable inference that [Emory] engaged in the alleged discrimination." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir.2011).

Judge Walker concluded that Butler failed to meet his burden on two fronts. She says that he failed to establish a prima facie case of retaliation and failed to raise a genuine dispute that Emory's proffered nondiscriminatory reason is pretextual.

Butler objects. He insists that he has made out a prima facie case despite Judge

Walker's conclusion that he did not identify a similarly situated comparator. And he also insists that he created a dispute as to whether Emory's explanation for denying him tenure is pretextual by identifying inconsistencies and anomalies in its explanation. The Court agrees with the magistrate judge.

To establish a prima facie case of discrimination, Butler must show that (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) Emory treated similarly situated employees outside the protected class more favorably; and (4) he was qualified to do his job. *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir.2003). The dispute here focuses on whether Butler has identified a similarly situated comparator who was treated more favorably. Butler points to Schaumann, who was also a professor in the German studies department. Schaumann received tenure the year before Butler's tenure application was denied. She was neither Jewish nor American, so Butler claims that she was a similarly situated comparator, outside the protected class(es), whom Emory treated more favorably.

Emory argued, and Judge Walker concluded, that Schaumann was not similarly situated to Butler because she did not have collegiality problems. According to Emory and Judge Walker, Butler had to identify an untenured professor who was outside the protected class(es), who was treated more favorably, and who *had collegiality problems*. This tracks Eleventh Circuit case law, which holds that a valid comparator must be "similarly situated to the plaintiff in all relevant respects." *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir.2012) (quoting *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir.2008)) (internal quotation marks omitted).

Butler disagrees. He points to case law in which our sister district courts have found college professors to be similarly situated "where the plaintiff [professor] and [the] comparator [professor] 'were faculty members in the same department and sought promotion and tenure in accordance with procedures that were applicable to both, and the time that each applied for promotion and tenure is reasonably related.'" *Martin v. Auburn Univ. Montgomery*, 908 F.Supp.2d 1259, 1267 (M.D.Ala.2012) (quoting *Morrow v. Auburn Univ. Montgomery*, 973 F.Supp. 1392, 1406 (M.D.Ala.1997)); *see also Jun Zhang v. Troy Univ.*, 2012 WL 3631547, at *8, No. 2:11-cv-770-MHT (M.D.Ala. July 23, 2012). But in the cited cases, there was no suggestion that the plaintiff suffered from collegiality problems or other similar behavioral issues. These cases are therefore not directly applicable here, and in any event are not binding authority.

Although the situations are not identical, the Court finds additional guidance from cases involving plaintiffs who bring discrimination claims based on discipline. In such cases, to establish a prima facie case, plaintiffs must show that other employees "[were] involved in or accused of the same or similar conduct and [were] disciplined in different ways." *McCann v. Tillman*, 526 F.3d 1370, 1373–74 (11th Cir. 2008) (quoting *Burke–Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006)) (internal quotation marks omitted). The comparator's misconduct must be "nearly identical." *Id.*

Butler's lack of collegiality is analogous to misconduct. Emory has a stated policy that collegiality plays a part in tenure decisions. Emory adduced evidence that Butler was not collegial. His lack of collegiality was, in a sense, a form of misconduct. And he was, in a sense, disci-

plined for that misconduct when he was denied tenure.[7] To show that another professor ·was similarly situated to him and treated more favorably, Butler must identify one who engaged in or was accused of similar misconduct—i.e., lacked collegiality—but was still awarded tenure. Butler has not made such a showing, so he has not made out a prima facie case.[8]

In any case, whether or not Butler has made out a prima facie case, the Court agrees with the magistrate judge that Emory is also entitled to summary judgment on a second ground: Butler failed to create a genuine dispute of fact as to whether Emory's nondiscriminatory reason for denying him tenure is pretextual. *See Alvarez*, 610 F.3d at 1265 (holding that if a plaintiff fails to show pretext, a court may decline to engage in a meaningless analysis of whether he established a prima facie case). Emory says it denied Butler tenure because he was not collegial. Its tenure policies explicitly include collegiality as an element of the decision. For that reason, and because an employee's collegiality could motivate a reasonable employer, Butler must rebut this nondiscriminatory reason head-on. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000) (en banc).

To create a jury question as to pretext, Butler may show that the nondiscriminatory reason should not be believed. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir.1998). If he demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Emory's] proffered [nondiscriminatory] reason[ ] for its action," then a reasonable fact-finder may not believe the proffered reason, and summary judgment should be denied. *See Alvarez*, 610 F.3d at 1265 (quoting *Combs*, 106 F.3d at 1538) (internal quotation marks omitted).

Butler attempts to do just this. He argued to the magistrate judge, and he argues in his objections, that a litany of facts undermines the plausibility of Emory's explanation. To wit: the members of the German studies department disagreed as to whether he lacked collegiality and whether a lack of collegiality should preclude tenure; the college's tenure and promotion committee did not conclude that he lacked collegiality; the difference between the fourth-year review (which was written by Höyng and detailed Butler's collegiality problems) and the fifth-year review (which was written by Maxim and did not mention collegiality) demonstrates that Höyng harbored discriminatory animus; no one can remember another professor who was de-

---

**7.** There is no dispute that Lewis, the ultimate decision-maker, honestly believed that Butler lacked collegiality. *See Stone*, 684 F.3d at 1136 ("Where an employee argues that he did not actually engage in misconduct, we have held that an employer may rebut this allegation by showing its good faith, honest belief that the employee violated a rule." (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991))).

**8.** Butler's discrimination claim rests on his allegation that Emory's characterization of him as lacking collegiality is pretext masking discrimination. That is, he says the lack-of-collegiality explanation is a sham. Accordingly, and without any supporting citations,

he argues that the Court cannot require him to identify a comparator who was also accused of lacking collegiality. The Court is mindful that when an employee's performance "is bound up in the inquiry into whether [his employer]'s proffered reason ... was a pretext for discrimination," it may defer consideration of his performance (or, in this case, an analogous characteristic like his lack of collegiality) from the prima facie case stage to the pretext stage. *See Alvarez v. Royal Atl. Developers*, 610 F.3d 1253, 1265 (11th Cir. 2010). But either way the result is the same here. Butler fails his burden at *both* the prima facie case and pretext stages.

nied tenure based on a lack of collegiality; and there is little evidence supporting certain negative characterizations of him.[9]

Butler also argues that the tenure process was, in his words, "plagued by procedural violations and inconsistencies." He says that Schaumann violated confidentiality; that Höyng refused to include the (positive) fifth-year review in his tenure application; that Schaumann's tenure application was treated differently from his own; that Schaumann and Höyng went on a "retaliatory witch hunt" to amass negative comments about him; and that several aspects of provost Lewis's conference call were irregular or procedurally improper, including the call itself, the absence of one of the department's professors from the call (who presumably would have supported Butler), and the fact that Lewis initially miscounted or misunderstood the votes of the faculty.

The magistrate judge addressed nearly all of these arguments, and the Court finds no error in her conclusions. Butler raises no new arguments in his objections. The Court adopts the magistrate judge's conclusions in full, and will merely add to her conclusions where appropriate.

The magistrate judge explained that mere dissension among the faculty about Butler's collegiality is not enough to raise an inference of pretext. The Court agrees. *See Tori v. Marist Coll.*, 344 Fed. Appx. 697, 700 (2d Cir.2009) (finding no genuine dispute as to pretext where there was disagreement over the quality of a tenure candidate's scholarship, and tenure was denied on that basis). And contrary to Butler's assertions, the tenure and promotion committee did not conclude that Butler was collegial. It concluded only that as an oversight committee it lacked the perspective or evidence to conclude one way or another. That is not dissension.[10]

The magistrate judge also explained that Butler's evidence does not show, as he claims, that he was the only professor ever to be denied tenure based on a lack of collegiality. It merely shows that no professor was denied tenure *above the department level* based on a lack of collegiality. Only three witnesses testified that they could not recall another candidate being denied tenure for a lack of collegiality: the provost, the president, and the professor who chaired the tenure and promotion committee's review of Butler's tenure file. Each of those witnesses reviewed a profes-

---

9. Butler also insists that the Court should not consider his personal emails to friends and colleagues disparaging the German studies department because the emails were not discovered until after the tenure decision, and therefore Emory could not have relied on them to make the decision. The Court agrees with the magistrate judge that the emails, though they were not considered by Emory at the time, tend to establish that Butler did in fact lack collegiality, thus buttressing its proffered reason for denying him tenure. But the result would be the same if the emails were not considered; they are not dispositive because the record contains a wealth of evidence upon which Emory *did* rely that plainly shows Butler's lack of collegiality.

10. One related fact the magistrate judge does not appear to have explicitly considered was

Butler's suggestion that the disparity between the fourth- and fifth-year reviews betrays a discriminatory animus on the part of Höyng, who prepared the fourth-year review. But, as stated, differences of opinion among colleagues as to an employee's collegiality do not raise a jury question. It is entirely likely, even probable, that not every one of an employee's colleagues will have the same opinion of him. And that such differences of opinion were expressed in year-end reviews prepared by two different reviewers does not, without more, demonstrate that one reviewer harbored discriminatory animus. Likewise with Butler's argument that some reviewers considered the evidence of his lack of collegiality to be insufficient to deny tenure.

sor's tenure candidacy only if his or her department recommended tenure. But, as the magistrate judge explained, it is likely that a professor so lacking collegiality would not even make it out of the department. So it is not surprising that officials who reviewed tenure decisions only *above the department stage* cannot remember a candidate making it to that stage with a positive recommendation and *then* being denied tenure.

Butler argues that the evidence supporting Emory's characterization of him as lacking collegiality was thin. But, as the magistrate judge described in nearly thirty-five pages of factual background, many of Butler's colleagues described him as lacking collegiality and described instances in which they believed that characteristic was demonstrated. And Lewis, the ultimate decision-maker, testified that he understood from his conference call with the German studies faculty that they all agreed that Butler's collegiality was a concern.

Judge Walker also addressed and dismissed each of Butler's protestations about the alleged procedural irregularities in his tenure review. The Court adopts those findings. As to what the magistrate judge called the "most troubling" of those procedural violations—the failure to include Butler's positive fifth-year review in his tenure file—the Court makes one additional note: even the chair of the tenure and promotion committee testified that the committee usually would *not* consider a candidate's fifth-year review. *See* [61–27] at 19 ("Typically as I recall, we would not see a fifth-year review or reviews in other years [other than the fourth].").

### C. Cat's Paw

One theory that the magistrate judge did not fully address is the "cat's paw" theory of discrimination. Butler does not

argue that provost Lewis, who ultimately denied his tenure application, harbored discriminatory animus. But he says Lewis acted as the "cat's paw of discrimination by" Höyng and Schaumann. Butler contends that Höyng and Schaumann harbored discriminatory animus, and Lewis simply followed their biased recommendation.

 This argument misses the mark. A plaintiff may use the cat's paw theory to impute a non-decisionmaking employee's discriminatory animus to an otherwise-neutral decision-maker. *See, e.g., Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir.1999). But in this case, even assuming Höyng and Schaumann harbored discriminatory animus, the cat's paw theory fails because Lewis did not rely solely on their recommendations.

Upon reading the tenure file, Lewis set up a conference call with every available member of the German studies department to discuss Butler's collegiality. Only after that conference call, in which he came to the conclusion that the faculty all agreed that Butler had collegiality issues, did Lewis decide to deny Butler's tenure application. To be sure, Höyng and Schaumann participated in this conference call, but no reasonable jury could conclude that Lewis acted as a mere conduit to give effect to their alleged discriminatory animus. *See id.* If anything, Lewis's decision to seek the counsel of the entire faculty about their collegiality concerns demonstrates that he attempted to sort out a difficult issue on his own and made the type of independent decision that undermines a cat's paw theory.

Ultimately, Lewis testified that he left the conference call with an understanding that *all* of the participating professors—not just Höyng and Schaumann—believed

that Butler had collegiality issues. The only point of disagreement, according to Lewis, was whether Butler's lack of collegiality should affect the tenure decision. And Lewis made the decision to deny tenure on the basis of Butler's lack of collegiality, believing that it was an important and overlooked criterion. In other words, Lewis came to the decision that denying Butler tenure was "entirely justified" even apart from any discriminatory animus allegedly harbored by Höyng and Schaumann. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S.Ct. 1186, 1193, 179 L.Ed.2d 144 (2011) (explaining that the cat's paw theory does not impute liability to an employer if it conducts an investigation and concludes that the adverse action was, "apart from the supervisor's [allegedly discriminatory] recommendation, entirely justified")

### D. State–Law Claim

Finally, the Court agrees with Judge Walker that, having dismissed all federal-law claims, the interests of judicial economy, convenience, fairness and comity are best served by remanding Butler's sole remaining state-law claim. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639, 129 S.Ct. 1862, 173 L.Ed.2d 843 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); *Blackmon v. Escambia Cnty. Sch. Bd.*, 568 Fed.Appx. 848 (11th Cir.2014) ("We 'encourage[ ] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.'" (quoting *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir.2004))).

### IV. Conclusion

The Court ADOPTS the R & R [111] as its order. Defendant's motion for summary judgment is GRANTED [61] as to Plaintiff's discrimination and retaliation claims. Plaintiff's remaining state-law claim is REMANDED to the Superior Court of DeKalb County, Georgia. The Clerk is directed to close this case.