[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11885
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2012
JOHN LEY
CLERK

Agency No. 11-029-ARB

STONE & WEBSTER CONSTRUCTION, INC.,

Petitioner,

versus

U.S. DEPARTMENT OF LABOR,
SECRETARY OF THE U.S. DEPARTMENT OF LABOR,

Respondents,

JAMES SPEEGLE,

Intervenor.

_____

Petition for Review of a Decision of the
Department of Labor

_____

(June 19, 2012)

Before DUBINA, Chief Judge, EDMONDSON, Circuit Judge, and GOLDBERG,* Judge.

_____

*Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

DUBINA, Chief Judge:

Petitioner Stone & Webster Construction, Inc. ("S&W") seeks this court's review of Respondent Secretary of Labor's decision in favor of S&W's former employee, James Speegle, who intervened in this case. In contradiction to the findings of an administrative law judge ("the ALJ"), the Secretary's Administrative Review Board ("the ARB") found that S&W gave pretextual, shifting explanations for terminating Speegle and found that Speegle suffered disparate treatment in comparison to other similarly situated employees. Consequently, the ARB found that Speegle proved S&W fired him for engaging in conduct protected by the Energy Reorganization Act ("ERA"). After reviewing the ALJ and the ARB's decisions on liability, reading the parties' briefs, and after having the benefit of oral argument, we grant S&W's petition for review and remand this case to the ARB.

## I.

*A. Facts*

From 1993 until 2004, James Speegle worked as a journeyman painter for S&W and other contractors at the Tennessee Valley Authority's ("TVA") Browns Ferry Nuclear Plant. In 2003 and 2004, Speegle worked for S&W on the Unit 1

Restart Project inside of the Torus, a large, circular vessel that surrounds the plant's reactor core and flushes water to the core in the event of a nuclear meltdown. The project included identifying failed paint coatings in the Torus, stripping paint, and repainting. From January 2004 until his termination, Speegle served as a foreman of a crew of apprentice painters.

Until May 2004, S&W used only journeyman painters like Speegle for painting the inside of the Torus because the G-55, a TVA manual that set out protective painting requirements, specifically called for "journeyman" painters who were certified to paint in a "Service Level 1" area. However, in early May 2004, S&W announced that it would certify "apprentice" painters to work in the Torus. Speegle believed that the G-55 only permitted the use of journeyman painters and that less experienced painters would jeopardize plant safety. The quality of the paint job mattered, as chipped paint or other debris could potentially clog pump motors and hinder the cooling process in the event of a meltdown. Speegle voiced his safety concerns to his supervisor, S&W's Super General Foreman, Sebourn Childers ("Childers"), who informed Speegle that the TVA regulations were being formally modified to call for "coating applicators" rather than journeyman painters. S&W's Lead Civil Superintendent, Rick Gero ("Gero"), consulted with site engineers, learned that it was acceptable to designate

3

his painters as coating applicators rather than journeyman painters, pursued proper procedures to revise the G-55's language, and began certifying experienced apprentice painters who could pass requisite TVA tests. Several times, Speegle and other journeyman painters voiced their concerns about allowing apprentices to do their work. While some journeyman painters felt that their jobs were being threatened by apprentice painters, Speegle objected because of nuclear safety. In spite of S&W's successful effort to legitimately revise the G-55 and the finality of the company's decision, Speegle and other journeyman painters refused to accept S&W's decision, and continued to complain to Childers and Gero. Speegle raised the issue to Childers at daily safety meetings. Each time, Childers indicated that the matter had been decided and would not be discussed.

During the safety meeting on Saturday, May 22, 2004, at which time Childers presented the official revision of the G-55 that accommodated apprentice painters, Speegle told Childers, in a loud voice and in front of several other subordinate employees, "You and management can take that G-55 and you can shove it up your ass." [R. 88 at 606.] Childers then stopped the meeting to defuse the situation. Another supervisor who heard the comment, Joe Albarado ("Albarado"), agreed with Childers that the disrespectful comment warranted disciplinary action. The same day, Childers and Albarado discussed the incident

4

with Gero by phone. Gero recommended suspension until further investigation. Two days later, after taking and comparing Childers' and Albarado's written statements, Gero decided to terminate Speegle for insubordination.

While two other S&W employees, James Jones and Santo Chiodo, were also fired for insubordination after making similar, disrespectful remarks to supervisors, each first received a warning before his termination. Jones, an engineer, called a plant official a moron; he also wrote several baseless letters criticizing S&W managers and co-workers, calling them names. S&W warned him to stop or action would be taken. After Jones screamed profanities at his supervisor in front of three or four other employees, S&W terminated him for insubordination. Chiodo lashed out at his foreman in front of co-workers and used vulgar language. He was warned that his conduct would not be tolerated. After another outburst, S&W likewise terminated Chiodo for insubordination.

*B. Procedural History*

Pursuant to the ERA's provisions, *see* 42 U.S.C. § 5851, Speegle filed a whistleblower complaint with the Secretary of Labor's Occupational Safety and Health Administration ("OSHA"), alleging that S&W violated the ERA by firing him for making nuclear safety complaints. S&W formally responded that it terminated Speegle for his insubordinate attitude and foul language exhibited

5

toward Childers at the May 22, 2004, meeting. OSHA investigated and dismissed the complaint. Speegle then appealed and sought a hearing. After receiving testimony and evidence, ALJ Richard D. Mills issued a thorough recommended decision and order ("the RDO"), recommending that Speegle's complaint be dismissed because the record lacked evidence suggesting that his termination was related to his statutorily protected activity. The ALJ found that Speegle engaged in protected activity when he complained about apprentice painters working in the Torus because he reasonably believed that S&W was violating the G-55 and that the apprentice painters were unqualified for the work. The ALJ further found that S&W knew about the protected activity and took adverse action against Speegle by terminating him. However, the ALJ determined that Speegle did not prove by a preponderance of the evidence that his suspension and later termination were related to his protected activity.

The ARB reversed the ALJ's RDO in its final decision and order ("the FDO"), concluding that Speegle's safety complaints contributed to S&W's decision to fire him. Specifically, the ARB found that substantial evidence in the record supported Speegle's argument that S&W's reasons for terminating him were pretextual and that Speegle was treated more harshly than similarly situated, insubordinate employees, namely Jones and Chiodo. Consequently, the ARB

6

remanded the matter to the ALJ for findings on Speegle's damages.[1]  A different

ALJ, Patrick M. Rosenow, entered an amended decision and order on stipulated

damages awarding Speegle back pay, two years front pay in lieu of reinstatement,

a purged employment file without reference to Speegle's protected activity and

discharge, compensatory damages, and damages for future psychiatric counseling.

S&W appealed to the ARB, objecting to the ARB's liability determination on the

grounds that the ARB had exceeded the scope of substantial evidence review and

that substantial evidence did not support the ARB's conclusion that Speegle's

protected activity caused S&W to suspend and terminate Speegle.  The ARB

summarily affirmed the ALJ's order on damages as well as the ARB's earlier FDO

on liability.  Pursuant to 42 U.S.C. § 5851(c), S&W timely filed this petition for

review with our court, seeking review of the ARB's decision on liability only.

Speegle filed a motion to intervene, which we granted.

## II.

We must review the ARB's decision pursuant to the standard of review

outlined in the Administrative Procedure Act.  *Fields v. U.S. Dep't of Labor*

*Admin. Review Bd.*, 173 F.3d 811, 813 (11th Cir. 1999) (per curiam).  We will

---

[1] S&W could not appeal the 2009 FDO to this court as we would have dismissed for lack of jurisdiction.  *See Fluor Constructors, Inc. v. Reich*, 111 F.3d 94, 95 (11th Cir. 1997).

overturn the ARB's findings if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the findings were made "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).  We conduct *de novo* review of the Secretary of Labor's legal conclusions, but we test the Secretary's factual findings for substantial evidence.  *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1571 (11th Cir. 1997).

## III.

### A. The scope of substantial evidence review

The ERA prohibits employers from taking adverse action against employees who report nuclear safety concerns.  *See* 42 U.S.C. § 5851(a).  An ERA whistleblower complainant must prove, *inter alia*, that his ERA-protected activity was a factor in his employer's decision to take the adverse action against him.  *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 933–34 (11th Cir. 1995).  The complainant's burden of proof is a preponderance of the evidence.  *See Dysert v. U.S. Sec'y of Labor*, 105 F.3d 607, 610 (11th Cir. 1997).  The Secretary's ARB found, in contradiction to the ALJ's findings, that Speegle proved an inference of causation between his protected activity and S&W's adverse action against him.

We have previously held that where the Secretary disagrees with the ALJ, we review the Secretary's decision "more critically," but ultimately, "the decision

8

is the Secretary's[,]" so long as the Secretary supports her decision with "articulate, cogent, and reliable analysis." *Herman*, 115 F.3d at 1572 (internal quotation marks omitted). In other words, we look for substantial evidence supporting the agency's final decision. *See* 5 U.S.C. § 706(2)(E). However, in 2007, the Secretary of Labor revised the ARB's standard of review of an ALJ's factual findings in an ERA case from *de novo* review to substantial evidence review. *See* 29 C.F.R. § 24.110(b). As a result, we now show less deference to an ARB that disturbs the factual findings of an ALJ. In order to ensure that the ARB observed the Secretary's regulation by reviewing the ALJ's RDO for substantial evidence, we must review the ALJ's RDO to see if it, rather than the ARB's FDO, was in fact based on substantial evidence.

Pursuant to the Secretary of Labor's regulation, the ARB should have reviewed the ALJ's factual findings for substantial evidence. 29 C.F.R. § 24.110(b). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (internal quotation marks omitted). Thus, substantial evidence exists even when two inconsistent conclusions can be drawn from the same evidence. *Zahnd v. Sec'y of Dep't of Agric.*, 479 F.3d 767, 771 (11th Cir. 2007). The substantial

9

evidence standard limits the reviewing court from "deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam). Although the ARB acknowledged that it was bound by the substantial evidence standard, the ARB showed little deference to the ALJ's findings with which it disagreed, and it disregarded the ALJ's conclusions supported by substantial evidence in the record.

*1. Evidence of shifting explanations*

The ARB disagreed with the ALJ's findings on whether S&W provided shifting explanations for terminating Speegle's employment. S&W documented its reason for Speegle's termination as "insubordination." [R. 94, Complainant's Ex. 25.] In July 2004, S&W responded to OSHA that Speegle was fired for his "insubordinate attitude and foul language" exhibited toward Childers at the May 22, 2004, meeting. [R. 88 at 833.] The ARB contrasted these explanations with Childers' and Gero's later testimony that Speegle was fired for his intent to disobey procedures, particularly the G-55, and that his use of profanity was not the cause of his termination. Furthermore, the ARB was unsatisfied that the ALJ did not support its findings with evidence in the record explaining what Speegle's "shove it" comment meant, or what procedures Speegle was unwilling to follow. Considering the record anew, the ARB found that there was substantial evidence

10

demonstrating that S&W offered different reasons for its action, which in turn substantiated the inference of pretext for terminating Speegle's employment. The question for the ARB, however, was not whether the ARB could support alternative factual findings with substantial evidence, but whether the ALJ could support its original findings with substantial evidence. *See* 29 C.F.R. § 24.110(b); *see also Adefemi v. Ashcroft*, 386 F.3d 1022, 1029 (11th Cir. 2004) (explaining that a review of factual findings under the substantial evidence standard does not consider "whether there is substantial evidence for some *other* finding that could have been, but was not, made" (internal quotation marks omitted)).

In the RDO, the ALJ explained that it did not find it inconsistent that S&W reported "insubordination and foul language" to OSHA, but later said that foul language had nothing to do with Speegle's termination because profanity was simply part of Speegle's insubordinate comment. Next, while it is true the ALJ's RDO does not specifically address what Speegle's comment meant or how it proved his contempt for company procedures, the ALJ most likely saw no need to explain how Speegle's comment ("You and management can take that G-55 and you can shove it up your ass") demonstrated insubordination and contempt for the revised procedures. Further, there is very little difference between S&W's initial description of Speegle's comment as "insubordination" and later description as

11

manifesting an intent to disobey or disregard procedures.[2]  Finally, as the initial factfinder, the ALJ was entitled to give weight to Gero's testimony, which it found to be consistent and credible.  Gero testified as to his belief that Speegle's conduct warranted termination and to his interpretation of the comment as an indication that Speegle would not submit to the G-55.  Therefore, the ALJ's finding that S&W did not offer shifting explanations was supported by substantial evidence.  The ARB did not observe "procedure required by law," 5 U.S.C. § 706(2)(D), and therefore, its decision was "not in accordance with law," *Id.* at § 706(2)(A), because it failed to review the RDO for substantial evidence.

*2. Evidence of disparate treatment*

The ARB also challenged the ALJ's conclusions on disparate treatment, finding that Jones and Chiodo were comparators because they also lashed out at superiors.  The ARB gave no weight to the fact that Jones and Chiodo had different supervisors.  It further rejected the ALJ's conclusion that Speegle's conduct was distinguishable from Jones' and Chiodo's conduct in that Speegle's comment showed his intent to disobey procedures.  Lastly, the ARB criticized the ALJ's finding that Speegle's insubordination was more serious because he made

---

[2] "Insubordination" is "the quality or state of being insubordinate: defiance of authority." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1172 (1986).  To be "insubordinate" is to be "unwilling to submit to authority: *disobedient*."  *Id*. (emphasis added).

his remark in front of subordinate employees. The ARB noted that S&W's Human Resources representative, Fran Trest, conceded that Jones, an engineer, would have been expected to conduct himself with the same dignity as Speegle, a foreman.

Again, the ARB did not show deference to the ALJ's findings that neither Jones nor Chiodo were adequate comparators. Testimony and evidence showed that Speegle differed from Jones and Chiodo in several ways. First, Speegle manifested a different level of insubordination insofar as he not only disrespected authority, but also showed contempt for company procedures. Moreover, Speegle possessed a different level of influence on co-workers who witnessed the insubordinate conduct. Speegle was insubordinate in front of a crew of subordinate co-workers who were also expected to submit to S&W's revised procedures. Finally, neither Jones nor Chiodo answered to Childers or Gero as a supervisor. Thus, the ALJ substantiated its conclusion with testimony and evidence from the record. Therefore, we conclude that the ARB erred, *see* 5 U.S.C. § 706(2)(A), (D), by refusing to accept the ALJ's findings which were based on substantial evidence.

**B. Application of Eleventh Circuit Title VII law**

Even if the ARB correctly found that the ALJ's findings were not supported

by substantial evidence, we must nevertheless grant S&W's petition for review because the ARB failed to correctly identify and follow our circuit's Title VII precedent in its FDO.  *See* 5 U.S.C § 706(2)(A).

### 1. The "nearly identical" standard for comparator misconduct

The ARB looked to Eleventh Circuit case law to support the proposition that Speegle could prove pretext by showing that comparator employees "who engaged in similar conduct, but who did not engage in protected activity, were not similarly treated."  [R. 119 at 13 (citing *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1563 (11th Cir. 1987)).]  The ARB held that to identify a comparator employee, "[t]he plaintiff need not prove that the [comparator's] conduct was the same or nearly identical, but only that it was similar."  [R. 119 at 13 (citing *Anderson v. WBMG-42*, 253 F.3d 561, 565 (11th Cir. 2001)).]  The ARB acknowledged that *Anderson*, however, contradicts *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (holding that a "comparator's misconduct must be *nearly identical* to the plaintiff's" (emphasis added)).  We resolved this conflict in favor of the "nearly identical" standard.  *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 n.2 (11th Cir. 2006) (per curiam) (reasoning that we are bound to follow the earliest panel decision on the issue, *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).  Thus, the ARB relied

14

upon a case that we have expressly set aside.

On appeal, the Secretary and Speegle both argue that this court's Title VII case law is only persuasive authority for the Department of Labor, and therefore, it does not matter that the ARB cited *Anderson*. However, the Secretary's ARB has said that in "inferential cases" like Speegle's where the parties contest the issue of causation (*i.e.*, whether the employee's protected activity contributed to the adverse action), "[the ARB] and reviewing courts *routinely apply* the framework of burdens developed for pretext analysis under Title VII of the Civil Rights Act of 1964 and other employment discrimination laws." *Overall v. TVA*, ARB Case Nos. 98-111 and 98-128, ALJ No. 97-ERA-53, slip op. at *10 (Dep't of Labor Admin. Rev. Bd. Apr. 30, 2001) (emphasis added) (internal quotation marks omitted). Our Title VII case law may not be binding, but the Secretary does not deny that her agency "routinely" follows it. Furthermore, the Secretary and Speegle do not explain what agency law we ought to apply instead of our own. Neither do they explain how the ARB intended to depart from our precedent while expressly citing our precedent. The Secretary only responds that we should afford deference to the ARB's FDO because Congress has given the Secretary the authority to enforce the ERA by formal adjudication. *See* 42 U.S.C. § 5851(b). However, the ARB decision did not construe the ERA, but rather, this court's Title

VII case law. If the Secretary cites our precedent, we are obligated to review, and if necessary, correct, her application of our precedent. *See* 5 U.S.C § 706(2)(A) ("[T]he reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . not in accordance with law."); *Herman*, 115 F.3d at 1571 (stating that we review the Secretary's legal conclusions *de novo*).

When evaluating an allegation of disparate treatment, we require that a comparator be "similarly situated to the plaintiff in all relevant respects." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008) (internal quotation marks and alterations omitted). The "quantity and quality of the comparator's misconduct must be nearly identical." *Burke-Fowler*, 447 F.3d at 1323. "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia*, 171 F.3d at 1368 (internal quotation marks omitted). We ask whether the comparator is involved in the same or similar conduct as the plaintiff yet disciplined in a different way. *Burke-Fowler*, 447 F.3d at 1323.

Although the ARB described Speegle's, Jones', and Chiodo's insubordinate misconduct as "identical," [R. 119 at 14], the ARB settled for merely similar conduct under *Anderson*. The record distinguished Speegle's offense from Jones's and Choido's offenses. Speegle was himself a leader (foreman) who disrespected

16

his supervisor and the company's procedures in front of his own subordinate employees. Thus, the quality of Speegle's misconduct was distinguishable from and not nearly identical to his comparators' misconduct. *See Burke-Fowler*, 447 F.3d at 1323. Furthermore, the ALJ noted that unlike Speegle, neither Jones nor Chiodo had Childers or Gero as his supervisor. While this fact is not dispositive alone, it is useful to further distinguish employees' situations. Thus, we conclude that the ARB erred in concluding that Jones and Chiodo were comparators and that Speegle was treated differently from similarly situated S&W employees.

*2. The import of an employer's honestly held belief about an employee's misconduct*

In deciding that S&W provided shifting explanations for Speegle's termination, the ARB discredited Gero's testimony that he interpreted Speegle's comment to mean that Speegle would not follow the G-55. S&W argues that the ARB erred in failing to consider what Gero and other supervisors honestly believed that Speegle's comment meant. Where an employee argues that he did not actually engage in misconduct, we have held that an employer may rebut this allegation by showing its good faith, honest belief that the employee violated a rule. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (reasoning that courts do not reexamine business decisions, and that "our inquiry

17

is limited to whether the employer gave an honest explanation" of the adverse action (citation omitted)); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).[3] Thus, even if Speegle's comment meant something else, or nothing at all, and even if Speegle never actually intended to disobey orders or procedures, Gero testified, and the ALJ found it credible, that he understood Speegle's insubordinate comment to mean that Speegle would not comply with the new policy and procedures. We conclude from the record that the ARB erred in discrediting Gero's consistent testimony about his interpretation of Speegle's comment.

## C. The propriety of remand to the agency

As a final matter, S&W asks this court to reinstate the ALJ's RDO rather than remanding this case to the ARB for further proceedings. S&W contends that remand would be futile and nothing more than a formality. The Secretary and Speegle ask that we remand the case to the ARB for two reasons: first, to afford it the opportunity to review the RDO in light of our decision; and second, to allow the ARB to consider Speegle's additional arguments that the ARB did not

---

[3] The ARB did not discuss *Elrod*, *Jones*, or any other Eleventh Circuit law concerning an employer's honestly held belief about the employee's misconduct. In her brief, the Secretary does not dispute our case law on this point. She simply defends the merit of the ARB's finding that shifting explanations negate the credibility of Gero's testimony concerning his honestly held belief. Thus, the Secretary's arguments depend upon our agreeing with her position that the ALJ's RDO was not supported by substantial evidence. As discussed *supra*, we do not agree.

18

consider when it first reviewed the RDO. In addition to challenging the ALJ's findings concerning shifting explanations and disparate treatment, Speegle also argued that the ALJ ignored other circumstantial evidence showing pretext: particularly, that Childers essentially admitted that Speegle's history of safety complaints influenced his recommendation to terminate Speegle's employment; that Childers attempted to intimidate other painters supporting Speegle after Speegle filed his complaint; and finally, that the Nuclear Regulatory Commission and TVA eventually validated Speegle's safety concerns.[4] The ARB never considered these arguments after it agreed with Speegle that the record substantiated Speegle's arguments on shifting explanations and disparate treatment.

It is an established principle of administrative law that an appellate court should not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *INS v. Ventura*, 537 U.S. 12, 16, 123 S. Ct. 353, 355 (2002) (per curiam) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S. Ct. 454, 459 (1943)). Thus, "the proper course, except in rare circumstances, is to remand [a matter] to [an] agency for additional investigation or explanation."

---

[4] The ARB specifically noted in the FDO that it was not reaching these additional arguments. [*See* R. 119 at 10 n.63.]

*Gonzales v. Thomas*, 547 U.S. 183, 186, 126 S. Ct. 1613, 1615 (2006) (per curiam) (quoting *Ventura*, 537 U.S. at 16, 123 S. Ct. at 355). In both *Gonzalez* and *Ventura*, the Supreme Court reversed the Ninth Circuit for failing to remand each case to the Board of Immigration Appeals where that agency had yet to consider issues in the first instance. *Gonzalez*, 547 U.S. at 186–87, 126 S. Ct. at 1615; *Ventura*, 537 U.S. at 17; 123 S. Ct. at 356. We have found the existence of rare circumstances and decided an issue in the first instance only when "the undecided issue [was] legal, not factual." *Calle v. U.S. Att'y Gen.*, 504 F.3d 1324, 1330 (11th Cir. 2007). The unresolved issues in the instant case are based on factual findings and will require the ARB to consider whether the ALJ's RDO was based upon substantial evidence. *See* 29 C.F.R. § 24.110(b). For these reasons, we must remand this case for further review of Speegle's additional arguments which the ARB did not consider in its FDO.

## IV.

In summary, we conclude that the ARB erred by reviewing the ALJ's decision *de novo* rather than observing the Secretary's regulation requiring substantial evidence review. We also conclude that the ARB failed to follow Eleventh Circuit precedent when analyzing its contrary factual findings. Therefore, we grant the petition for review, and remand the case to the Secretary

20

for further proceedings consistent with this opinion.

**PETITION GRANTED AND REMANDED.**