[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14110
_____

Agency Docket No. ARB 13-076

HARLEY MARINE SERVICES, INC.,

Petitioner,

versus

U.S. DEPARTMENT OF LABOR,
ADMINISTRATIVE REVIEW BOARD,
JOSEPH D. DADY, Captain,

Respondents.

_____

Petition for Review of a Decision of the
Occupational Safety and Health Administration
_____

(January 26, 2017)

Before WILSON and JULIE CARNES, Circuit Judges, and TREADWELL,[*]
District Judge.

--------

[*]    Honorable Marc T. Treadwell, United States District Judge for the Middle District of
Georgia, sitting by designation.

PER CURIAM:

Pursuant to 49 U.S.C. § 31105(d), Harley Marine Services, Inc. (Harley) seeks review of the Secretary of Labor's final order that Harley terminated the employment of Captain Joseph Dady in violation of the Seaman's Protection Act (SPA), 46 U.S.C. § 2114. After thorough review and with the benefit of oral argument, the Secretary's determination is affirmed.

## I.

Dady was a tug captain for Harley.[1] On October 12, 2010, Dady's mate ran the barge they were towing into a dock, an allision in maritime terminology,[2] while Dady was asleep and off-watch. The mate, as well as the rest of Dady's crew, then failed to timely report the allision to Dady or Harley. When Dady later towed the now oil-laden barge out to sea, the barge began to take on water due to a puncture from the allision. This is when Dady first learned of the allision. Dady followed procedure upon learning of the allision, and the barge was saved.

Harley sent an investigator, Captain Graham, to determine the reason the allision had not been timely reported. Graham determined that even though Dady was asleep and off-watch, he should be held responsible for the failure to report and should be discharged, which Harley promptly did.

---

[1]    The facts are taken from the Administrative Law Judge's decision. *ALJ Decision*, HMS App. Vol. I. They are supported by substantial evidence.

[2]    An "allision" is "[t]he contact of a vessel with a stationary object such as an anchored vessel or a pier." *Allision, Black's Law Dictionary* (10th ed. 2014).

Dady filed a whistleblower complaint with the Occupational Safety and Health Administration, alleging that he had been terminated in retaliation for engaging in activities protected by the SPA. OSHA disagreed, and Dady filed an objection and requested a hearing before an administrative law judge. After a three-day evidentiary hearing, the ALJ agreed with Dady and ordered his reinstatement. Harley appealed to the Administrative Review Board (ARB), which affirmed.

On appeal, Harley argues that the ARB erred in concluding that: (1) substantial evidence supported the ALJ's finding that Harley knew that Dady engaged in protected activity; (2) substantial evidence supported the ALJ's finding that protected activity contributed to the termination of Dady's employment; (3) substantial evidence supported the ALJ's finding that Harley did not prove by clear and convincing evidence that it would have fired Dady regardless of the protected activity; and (4) that reinstatement was an appropriate remedy.

## II.

Under the Administrative Procedure Act, we review whether the Secretary's "action[s], findings, and conclusions" are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). On an appeal following an evidentiary hearing, this means "[w]e conduct *de novo* review of the Secretary of Labor's legal conclusions, but we test the Secretary's factual findings for substantial evidence" in the agency record. *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1132 (11th Cir. 2012); *see* 5 U.S.C. § 706(2)(E); *see also Atlanta Gas Light Co. v. FERC*, 140 F.3d 1392, 1397 (11th

3

Cir. 1998) (noting that the substantial evidence standard "is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings" (quoting *Md. People's Counsel v. FERC*, 761 F.2d 768, 774 (D.C. Cir. 1985))); *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) ("The distinctive function of paragraph (E)—what it achieves that paragraph (A) does not—is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies.").

> Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Thus, substantial evidence exists even when two inconsistent conclusions can be drawn from the same evidence. The substantial evidence standard limits the reviewing court from "deciding the facts anew, making credibility determinations, or re-weighing the evidence."

*Stone & Webster Const., Inc.*, 684 F.3d at 1133 (citations omitted).

## III.

There are four elements to Dady's SPA retaliation claim: (1) Dady engaged in protected activity; (2) Harley knew of the protected activity; (3) Dady suffered an adverse employment action; and (4) the protected activity contributed to the adverse employment action. *See* 46 U.S.C. § 2114; 49 U.S.C. §§ 31105(b), 42121(b).[3] An employer can defeat an SPA claim by demonstrating by clear and

---

3    In relevant part, 46 U.S.C. § 2114 provides:

> A person may not discharge or in any manner discriminate against a seaman because . . . the seaman in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a

4

convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity. *Id.*

IV.

## A.     Harley's Stipulation of Protected Activity

Harley stipulated before the ALJ that Dady engaged in protected activity. As the ALJ explained in his order:

> [Harley] stipulated that it does not contest the issue of protected activity. [Harley] listed, at RX 24 (Corrected), the only protected activity it understood [Dady] to be alleging: (1) [Dady]'s direct complaint in January 2009 to the U.S. Coast Guard that [Harley] dumped raw sewerage in New York Harbor; (2) steering failure in April 2010; (3) report regarding issues with QMs in May 2010; (4) and [Dady]'s request to a local union representative to complain to the Coast Guard in Seattle about inadequate crewing of [Harley]'s vessel. I accept that the four activities above constitute protected activity. [Dady] clarified, at the hearing, that the subject matter of the fourth protected activity stipulated to—improper

---

violation of a maritime safety law or regulation prescribed under that law or regulation has occurred[.]

. . . .

A seaman alleging discharge or discrimination in violation of subsection (a) of this section, or another person at the seaman's request, may file a complaint with respect to such allegation in the same manner as a complaint may be filed under subsection (b) of section 31105 of title 49. Such complaint shall be subject to the procedures, requirements, and rights described in that section, including with respect to the right to file an objection, the right of a person to file for a petition for review under subsection (c) of that section, and the requirement to bring a civil action under subsection (d) of that section.

46 U.S.C. § 2114(a)(1)(A), (b).

5

> crewing—includes both improper lookout and violations of the 12-hour work rule. *See* Tr. at 215. [Harley's New York General Manager] testified that it was his understanding that improper lookout is a subset of the manning issue. *Id*. at 746.

*ALJ Decision* at 30, HMS App. Vol. I.

In its post-trial briefing, Harley appeared to back away from its stipulation of protected activity, an effort the ALJ noted and rejected:

> [Harley] repeatedly raises the question of whether the protected activities actually took place (e.g., "Captain Dady appeared to testify that he reported [the incident related to sewage] to the Coast Guard at **some unknown time**, but the record contains no other proof in this regard." Post-trial Brief at 10-12 (emphasis in original)). However, since [Harley] stipulated to the protected activities, they will be presumed to have taken place for the purpose of analyzing employer knowledge.

*Id*. at 30 n.4.

Harley seems to resurrect this strategy on appeal, arguing in its briefs that it "stipulated *only* that element (1) was *satisfied* – that [Dady] engaged in protected activity," but that "[w]ith respect to [Dady]'s *allegations* of protected activity, [Harley] did not stipulate to any 'assertions made therein.'" *HMS Opening Brief* at 14. Indeed, many of Harley's arguments in its briefs and at oral argument weave in assertions that Dady did not engage in the stipulated protected activities, subtly challenging the ALJ's interpretation of the stipulation. At oral argument, when asked to explain its position on this issue, Harley maintained that the ALJ abused his discretion when, for example, he concluded that Harley had stipulated that

Dady's protected activity included complaining to the Coast Guard about improper or inadequate crewing on Harley's boats. The Court disagrees.

In a letter dated February 20, 2013, Harley stipulated: "For purposes of *this matter* only, . . . that element '(1) Protected Activity' is satisfied, meaning that it will not challenge that element (that the complainant engaged in protected activity). By so stipulating [Harley] is not affirming that any of the alleged protected activity was correct in any assertions made therein, or otherwise even occurred for purposes outside *this matter*." *Stipulation Letter*, HMS App. Vol. I (emphasis added). Harley offered no clarification when it entered the stipulation on the record at trial. *See ALJ Tr.* 14:13-19, HMS App. Vol. I.

The ALJ reasonably interpreted Harley's stipulation. Indeed, no other interpretation makes sense. Harley stipulated in "this matter" that Dady engaged in protected activity, thus relieving Dady of his burden to prove that he had. Thus, when the ALJ moved to the second element of Dady's claim, employer knowledge, the question the ALJ addressed was whether Harley had knowledge of the stipulated protected activity. Under the interpretation of the stipulation urged by Harley, Dady, to prove employer knowledge, would have to first prove that he had engaged in the same protected activity that Harley had stipulated to for the purpose of the first element of Dady's claim. Clearly, this interpretation renders the stipulation meaningless. In short, Harley's stipulation that Dady engaged in his "alleged protected activity" in "this matter" established exactly that.

**B.      Employer Knowledge and Contributing Factor**

Given that the ALJ properly interpreted Harley's stipulation of protected activity, the question of whether Dady established the remaining elements of his claim is straightforward.  Substantial evidence supports the Secretary's conclusion that Harley knew of Dady's stipulated protected activities, most particularly, Dady's inadequate crewing complaints to the Transportation Safety Advisory Committee.  As noted by the ALJ, Dady made numerous internal complaints about his inadequate crewing concerns and followed up on them internally.  Much to Harley's chagrin, Dady even mentioned his inadequate lookout concerns to the media.[4]  Harley's management was aware of Dady's previous official reporting of sewage-runoff and steering-failure violations, and thus was aware of Dady's propensity to file official reports.  Dady's official-reporting propensity and persistence in addressing his inadequate crewing concerns, internally and with the public, is substantial circumstantial evidence that Harley decision-makers knew that Dady had officially reported or would report the issues he had raised.

Similarly, substantial evidence supports the Secretary's determination that Dady's protected activities were a contributing factor in Dady's discharge. Dady worked for Harley for a little over three years.  Over the course of his employment,

---

[4]    Dady's media contacts followed an incident that did not involve Harley's boats, and were not included in the stipulation of protected activity.  But contrary to Harley's argument, the ALJ did not find that this constituted protected activity.  Rather, the ALJ reasoned that Harley's dissatisfaction with Dady's complaints to the media about inadequate lookouts in that situation provided indirect evidence that Harley knew Dady was, as stipulated, reporting his concerns about inadequate lookouts on Harley's boats to the Coast Guard, which contributed to his discharge. *ALJ Decision* at 35-36, 41, HMS App. Vol. I.

he engaged in a course of protected activities, and these activities drew animus from Harley officials. For example, the operations engineer for Harley's New York operation expressed displeasure that Dady had reported the steering failure to the Coast Guard, referring to him as "a pain in the ass." *OSHA Tr*. 46:15-24, HMS App. Vol. III. Also, other employees who reported problems were labeled as being "as bad as Dady." *Id.* at 46:24-47:3.[5]

It appears that the "last straw" occurred shortly before the allision, when Dady discussed his inadequate lookout concerns with the media. Substantial evidence supports the ALJ's finding that Harley Franco or his sister Deborah Franco, Harley's two top-ranking executives, near the end of September, 2010, conveyed their displeasure and their desire to fire Dady regarding his discussions with the media. The ALJ painstakingly details substantial evidence that the allision investigation was a witch-hunt to support Dady's predetermined termination. Under these facts, the ALJ reasonably concluded that the allision, a month after the threat to fire Dady for his media contacts, was simply the first excuse Harley found to terminate Dady. Similarly, the ALJ reasonably concluded that because Dady would not drop his crewing concerns (but rather was following up on them internally, with the media, and through official reporting), Harley fired him. While Dady's going public with the concerns may have been the last straw,

---

[5]    Harley mischaracterizes the "as bad as Dady" quip as "a complete red herring" relating to the "mechanic's group teasing Capt. Dady for having equipment breakdowns," "not whistleblowing activity." *HMS Reply Brief* at 16-17. The ALJ found that these statements related chiefly to Dady's reputation for reporting safety concerns (*ALJ Decision* at 50, HMS App. Vol. I), and this finding is supported by the record (*ALJ Tr*. at 565:11-17, HMS Sup. App. to Reply Brief; *OSHA Tr*. 46:13-47:7, HMS App. Vol. III).

the ALJ reasonably concluded that Dady's official reporting was another, overlapping straw; in other words, it was a contributing factor.

Accordingly, substantial evidence supports the ALJ's conclusion that Harley knew that Dady was officially reporting his inadequate crewing concerns, and that this knowledge was a contributing factor in Harley's decision to fire Dady.

## C.    Harley's Asserted Independent Nondiscriminatory Reasons

It follows that Harley did not show by clear and convincing evidence that it would have fired Dady even if he had not engaged in the stipulated protected activities.  Aside from emphasizing the integrity of its own investigation in the face of the numerous shortcomings detailed by the ALJ, Harley offers its internal procedure manual and the termination of another tug captain, as a supposed comparable employee scenario, to prove that it would have fired Dady regardless of his protected activities.  But substantial evidence supports the ALJ's finding that Harley's internal manual did not unambiguously require Dady's termination.  And the termination of the other tug captain is easily distinguishable: that captain actually caused a collision and then lied about it in his report; Dady, on the other hand, did not cause the allision and truthfully reported as soon as he knew about it.

## D.    The Order of Reinstatement

Harley argues that the ALJ and ARB erred in ordering Dady's reinstatement. The ALJ reasoned that reinstatement is a presumptive remedy under applicable regulations and found that the evidence presented at trial did not overcome that

presumption.[6]  Because the remedy is presumptive and automatic, we reject

Harley's contention that a party waives his right to reinstatement when he requests,

as Dady did, front pay instead of reinstatement.  Similarly, we reject Harley's due-

process argument; because reinstatement is the presumptive remedy, Harley was

on notice that it had to overcome this presumption to prevent Dady's reinstatement.

V.

In conclusion, Harley has failed to demonstrate that the Secretary's

determination—that Harley terminated Dady in violation of the SPA and that Dady

should be reinstated—was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law" or "unsupported by substantial evidence."

**AFFIRMED.**

---

[6]    The ALJ relied on regulations that were promulgated under the Surface Transportation Assistance Act (STAA), apparently as applicable under 46 U.S.C. § 2114(b)'s incorporation of "procedures, requirements, and rights described in" designated sections of the STAA.  *ALJ Decision* at 45, HMS App. Vol. I.  The ARB, on the other hand, relied on the new SPA counterpart regulation—29 C.F.R. § 1986.109—promulgated as an interim rule in early 2013. *ARB Decision* at 5, HMS App. Vol. I; *see also Procedures for the Handling of Retaliation Complaints under the Employee Protection Provision of the Seaman's Protection Act (SPA), as Amended*, 78 FR 8390 (February 6, 2013).  The ARB decision did not recognize that 29 C.F.R. § 1986.109 was not relied on by the ALJ and was not promulgated until after Dady filed his complaint.  Regardless, Harley did not challenge on appeal that, under these regulations, reinstatement was Dady's presumptive remedy in this action, and even cites 29 C.F.R. § 1986.109(d) as controlling, arguing that under these facts, reinstatement is not "appropriate" within the meaning of the regulations.  *See HMS Opening Brief* at 30; *HMS Reply Brief* at 28-29.

11