[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11123
Non-Argument Calendar
_____

D.C. Docket No. 2:14-cv-01702-RDP


THOMAS CHRISTOPHER WHITE,

Plaintiff-Appellant,

versus

WINN DIXIE,

Defendant,

WINN DIXIE MONTGOMERY LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(July 9, 2018)

Before ROSENBAUM, HULL, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Thomas White, proceeding *pro se*, appeals the district court's grant of summary judgment to his former employer, Winn Dixie Montgomery LLC ("Winn Dixie"), on his complaint alleging claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a); race discrimination and retaliation in violation of 42 U.S.C. § 1981; interference and retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615; and failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a). After careful review, we affirm.

## I. Factual Background

White is an African-American man who began working for the Winn Dixie supermarket chain in April 2009. Originally hired as a grocery manager, he was promoted one year later to the position of center store manager. He remained in that position until April 2013, when he became a service-area manager, the position he held until his termination in January 2014. Center store manager and service area manager were both salaried positions with no overtime pay.

White worked at three different stores during his employment with Winn Dixie: Store 595, Store 405, and Store 461. As a center store manager, he began

2

at Store 595, where he reported to Store Director Monica Sledge. Sledge completed White's 2010 annual performance review on June 25, 2010. Although Sledge noted that White was new in the position and "on target" or "above target" in many areas, she also noted that White needed improvement in various areas, including shrink, freshness, greeting and thanking customers, and offering assistance. Sledge commented that White "need[ed] to work with his associates to get everybody improving customer service" and he "need[ed] to help in customer and general liability to improve the safety of the building." In the overall summary, Sledge noted that White was new in his position.

In a declaration prepared for this case, Sledge stated that she observed several deficiencies in White's performance as center store manager at Store 595. According to Sledge, White "failed to manage, train, and properly supervise his staff," he had poor time-management skills, he would frequently leave the back store room in disarray, and he often failed to check for out-of-date products.

In July 2010, White was transferred to Store 405, where he reported to Store Director Derrick Bell. Bell completed White's annual performance review in November 2010. Bell wrote that White was "on target" and gave him mostly complimentary reviews. Bell noted, however, that White must hold the department managers who reported to him accountable for store conditions and daily tasks. Specifically, according to Bell, there were problems in the grocery department and

3

White needed to "do a better job of coaching and holding the [assistant] grocery managers accountable for their performance."

In late 2012, Jason Hardy became the district director responsible for managing Stores 595, 405, and 461, among others. The directors of each store reported to Hardy. Britt Pietruszewski managed human-resources functions at these same stores.

According to Pietruszewski, in early 2013 he and Hardy discussed poor store conditions at Store 405, which they attributed to store managers, including White, failing to consistently coach staff and hold staff accountable for performance. Seeking a fresh start at Store 405, Winn Dixie transferred White back to Store 595.

At Store 595, White again reported to Sledge, and he eventually became a service-area manager. In that role, White's duties included staffing, scheduling, and supervising employees in the service area of the store. Sometimes White also served as manager on duty ("MOD"). When serving as MOD, White was responsible for the entire store; ten to twelve employees reported to him, and he was responsible for ensuring that all departments were closed, end caps (displays at the end of an aisle) were straightened, and the store was locked.

In June 2013, Hardy called a meeting of the managers to discuss issues concerning unloading trucks in a timely manner. Sledge and White both advised Hardy that the problem was the lack of good dependable help, and White said that

he was working 15-hour days to get the work done.  After the meeting, according to White, Sledge told him that he had "a target on [his] back" and that he "need[ed] to take [himself] on down to the EEOC." White did not explain why Sledge advised him to go to the EEOC, however.

In her declaration, Sledge stated that, after White's transfer back to Store 595, she observed the same performance issues she had previously noticed, and she discussed these issues with Hardy and Pietruszewski.  Sledge also told Hardy and Pietruszewski that the back store room was sometimes in disarray because of White's disorganization while setting up and removing display ads.  Sledge agreed with Pietruszewski's recommendation that White be placed on a performance improvement plan ("PIP"), but she did not finish preparing the PIP before she was transferred to another store.

Keith Durham replaced Sledge as the director of Store 595 in early July 2013.  A few weeks later, White received notice that he was being transferred to Store 461.  On July 22, 2013, White's last day at Store 595, Durham issued him a written warning stating that he had neglected certain duties while serving as MOD the night before, including customer and employee safe-store conditions, cleaning the store and floors, and clearing the parking lot of carts.  According to one of White's affidavits, Durham apologized to him for the warning and said he was told "to have some documentation on [White] before [he] left."

5

White started at Store 461 in late July or early August of 2013. There, he reported to Store Director Raymond (Glenn) Leimbach. Leimbach and White had previously worked together for two weeks at another grocery store, Bruno's. White had filed a charge of race discrimination and retaliation against Bruno's with the Equal Employment Opportunity Commission ("EEOC"). In that charge, White alleged that he was retaliated against after he complained to Leimbach that a female employee and another manager had an improper relationship.

White explained to Hardy before the transfer that he was worried Leimbach would be biased against him because of the prior EEOC charge. Hardy told him not to worry. It appears that Hardy then spoke with Leimbach about these matters.

Meanwhile, Winn Dixie also transferred Shane Miller, a white male, to Store 461 to serve as assistant store director. Winn Dixie produced evidence that all other managers than the store director reported to Miller, including White, but White denies that he was supervised by Miller. For purposes of our review, we accept White's version of the facts on this matter, *see Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) ("[W]e accept the nonmovant's version of the events when reviewing a decision on summary judgment."), though it is undisputed that Miller was a higher-level manager than White.

Pietruszewski advised Leimbach that both White and Miller had performance deficiencies and that PIPs had been proposed for both of them.

6

Leimbach observed their performance over the next few weeks before issuing PIPs. In a declaration, Leimbach testified that he observed the following deficiencies in White's performance: he "failed to complete ads on time; failed to ensure proper policing of items of removal of out-dated items; failed to supervise his staff and ensure that staff provided excellent customer service; and failed to properly hire and schedule associates to maintain the proper ratio of part-time to full-time employees." As for Miller, Leimbach observed that he "had difficulty effectively leading subordinates, complying with store processes, scheduling employees, and merchandising products."

Leimbach issued a PIP to Miller on August 31, 2013, and a PIP to White on September 2, 2013. White's PIP indicated that he needed to improve pricing issues. It further stated that he needed to work on customer service and dress-code issues for all team members, as well as issues with the ratio of part-time to full-time employees.

According to Leimbach, Miller's performance improved, but White's performance declined. Regarding White's performance, Leimbach noted that advertisements were not placed in a timely manner, pricing signage was missing, the store received poor customer-service ratings, areas for which White was responsible were not cleaned properly, the service area was rarely fully staffed with the number of people needed to cover shifts, and White continued to schedule

7

part-time associates over the maximum twenty-four hours per week. On September 18, 2013, about two weeks into the PIP, Leimbach gave White a list of items that needed his immediate attention because, in Leimbach's view, White's performance had not improved.

On October 14, 2013, a corporate auditor from Winn Dixie audited Store 461 to ensure that it was maintaining fresh product. During these audits, a corporate auditor checks for out-of-date product, temperature holdings, and pest infestations. The store failed the audit because of two critical violations in the Meat Department. White had been the MOD the night before the audit. As MOD, he was responsible for ensuring all departments were properly cleaned and closed, and out-of-date product was removed from the shelves. Leimbach issued White a written warning that faulted him for failing to fulfill his responsibilities as MOD the night before the audit.

On October 18, 2013, Leimbach discovered out-of-date seafood and chicken as he inspected the store as part of his routine duties. Once again, White had been the MOD the previous night. Leimbach issued White a final written warning. After these events, according to Leimbach, he lost confidence in White's ability to serve as service-area manager, and, in late October 2013, he discussed with Pietruszewski whether White should be discharged. Pietruszewski testified that he began preparing White's termination paperwork on or around November 3, 2013.

8

On October 24, 2013, White filed a charge of discrimination with the EEOC. White alleged that Leimbach had retaliated against him for the prior EEOC charge by placing him on a PIP, not allowing him breaks, and scheduling him to work more closing shifts than other managers.  Winn Dixie received notice of the charge in early November 2013.  However, Pietruszewski and Leimbach both testified that they were unaware of this charge before White filed this lawsuit.

On November 12, 2013, store employees informed Leimbach that White had failed to assist with long lines at the store the previous day because he was in the back room watching a basketball game.  White concedes that he was in the back room at the time looking at his iPad, though he claims that he was on break and was not violating company policy.  The next day, Leimbach told White that his behavior was inappropriate and that it set a bad example for front-end associates. During this "heated" discussion, according to White, Leimbach called him "boy."

After this discussion, White called Winn Dixie's employee hotline to report that Leimbach had been harassing and mistreating him.  Hattie Andrews, an associate-relations specialist, investigated White's complaint.  Andrews spoke with White, who complained that Leimbach called him "boy," unfairly scheduled him for the majority of closing shifts, and denied his requests for vacation.  White further stated that he was unable to complete the PIP because he was always

9

performing MOD duties.    He also complained that Miller did not check temperature logs on a certain date but was not written up for it.

Meanwhile, on November 16, 2013, Pietruszewski completed the paperwork for White's termination, but he was directed to delay processing it pending the investigation of White's complaint.    White spoke with Andrews about his complaint again on December 3.

White took vacation from December 14, 2013, to December 17, 2013. When he returned, he learned that Leimbach had denied his request for vacation from December 26, 2013, to January 1, 2014.    Leimbach told White that two MODs could not be on vacation at the same time and another MOD had submitted his request for the same time period before White.    According to White, however, the other MOD stated that Leimbach directed him to request the same days off as White so that Leimbach could deny White's request.    White confronted Leimbach about these matters.    As he was about to leave Leimbach's office, Leimbach "screamed" at White to "bring your black ass back here[,] boy."    White responded, "I told you before I'm 52 years old and I am not your boy."    Leimbach then told White to "get the hell out of here."

Because of the stressful encounter with Leimbach, White began to experience chest pains, palpitations, and back pain.    White went to the doctor on December 20, 2013, and, that same day, he emailed Pietruszewski about how to

10

file for FMLA leave.  In response, he received an electronic FMLA packet and was informed that he had three weeks to return a completed medical-certification form.

About an hour after he emailed Pietruszewski, White was notified that his internal complaint had been closed.  Andrews had finished her investigation. Thereafter, Pietruszewski received approval to proceed with termination.  White returned his medical certification for his FMLA request on January 1, 2014.  That same day, White noticed a new name on the manager's schedule.  He says that this new manager was a white male.  Two days later, on January 3, 2014, Hardy and Pietruszewski notified White that Winn Dixie was terminating his employment. White then supplemented his EEOC charge, including allegations that he was fired due to his race and in retaliation for the October 2013 EEOC charge.

## II.  Procedural History

After receiving his right-to-sue notice from the EEOC, White filed suit against Winn Dixie in federal district court.  In a counseled amended complaint, he alleged claims of (1) race discrimination in violation of both Title VII and § 1981; (2) retaliation for filing the October 2013 EEOC charge in violation of both Title VII and § 1981; (3) interference and retaliation in violation of the FMLA; and (4) failure to pay overtime in violation of the FLSA.  His counsel withdrew during discovery, and he proceeded *pro se* from then on.

The district court granted Winn Dixie summary judgment. The court first found that White had failed to establish a *prima facie* case of race discrimination for lack of a proper comparator. The court concluded that White was not similarly situated with Miller, who held a different position and did not engage in similar misconduct after being placed on a PIP. As for White's retaliation claims, the court found White could not establish a *prima facie* case because there was no evidence that either Leimbach or Pietruszewki was aware of his EEOC charge when they initiated termination proceedings.

The district court further explained that, even if White could establish *prima facie* cases of race discrimination and retaliation, his claims still failed because he had not shown that Winn Dixie's legitimate, non-discriminatory and non-retaliatory reasons for his termination—performance deficiencies and misconduct while already on a PIP—were a pretext for race discrimination or retaliation. White's arguments, in the court's view, amounted to little more than a disagreement with Winn Dixie's assessment of his performance.

With regard to White's remaining claims, the district court found that White's FMLA claims failed because uncontradicted evidence in the record showed that the decision to terminate his employment was contemplated before he even requested FMLA leave. And his FLSA overtime claim failed, according to the court, for two independent reasons: (1) he failed to show that he was

12

improperly compensated for overtime work; and (2) even if he was improperly compensated, he was exempt from the FLSA's overtime-pay requirement because he served in a bona fide executive capacity.  White now appeals.

### III.  Standard of Review

We review a district court's order granting summary judgment de novo, viewing all the evidence and drawing all reasonable inferences in favor of the non-moving party.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).  Summary judgment is appropriate when the record demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

A genuine factual dispute exists if a reasonable jury could return a verdict for the non-moving party.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).  A "mere scintilla" of evidence in favor of a non-moving party is not enough.  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).  Likewise, summary judgment may be granted where the evidence is "merely colorable, or is not significantly probative of a disputed fact."  *Id.* (quotation marks omitted).  We liberally construe the filings of *pro se* parties.  *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998).

## IV.  Discussion

### A.  Race Discrimination

Both Title VII and § 1981 prohibit employment discrimination on the basis of race.  *See* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981.  In employment cases, we apply the Title VII analysis for both claims because Title VII and § 1981 have the same requirements of proof and use the same analytical framework.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Discrimination can be proven through direct or circumstantial evidence.[1] *Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000). When a claim is based on circumstantial evidence, as it is here, we ordinarily apply the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2]  *Vessels*, 408 F.3d at 767.

---

[1] Our binding precedent precludes the conclusion that Leimbach's "boy" comments are direct evidence of discrimination, as White maintains.  "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  *Standard*, 161 F.3d at 1330.  "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Id.*  Leimbach's comments are not direct evidence of discrimination because they do not prove discriminatory intent "without any inference or presumption."  *Id.*  Nevertheless, we consider them when evaluating White's circumstantial evidence of discrimination.  *See id.*

[2] The *McDonnell Douglas* framework applies to only "single-motive" claims based on circumstantial evidence.  *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235–40 (11th Cir. 2016) (distinguishing between "single-motive" and "mixed-motive" claims of discrimination under Title VII and explaining that the *McDonnell Douglas* framework does not apply to mixed-motive claims).  Because the parties present their arguments solely under the *McDonnell Douglas* framework, which is the framework applied by the district court, we do not consider whether White presented sufficient evidence to survive summary judgment based on a mixed-motive theory of discrimination.

14

Under the *McDonnell Douglas* framework, the plaintiff must first create an inference of discrimination by establishing a prima facie case. *Id.* The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If the employer does so, "the inference of discrimination drops out of the case entirely," and the plaintiff then has the opportunity to show that the employer's proffered reasons were pretextual. *Id.* at 768. The plaintiff's burden at the pretext stage "merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against [him]." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

A plaintiff may satisfy his burden at the pretext stage "by showing that [the employer's] proffered reasons are not credible." *Id.* In most cases, "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–48 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

To show that an employer's reason is not credible, the employee must meet that reason head on and rebut it; he may not merely quarrel with the wisdom of that

15

reason.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

A plaintiff may do so by showing "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's rationale."  *Holland v. Gee*, 677

F.3d 1047, 1055-56 (11th Cir. 2012) (quotation marks omitted).  In analyzing the

employer's reasons, however, "we must be careful not to allow Title VII plaintiffs

simply to litigate whether they are, in fact, good employees."  *Alvarez*, 610 F.3d at

1266.  The wisdom or fairness of the employer's decision is not at issue, only

whether the employer gave an honest (and non-discriminatory) explanation for its

behavior.  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

A plaintiff may also defeat a summary-judgment motion "by offering

evidence that [the employer] more likely than not acted with a discriminatory

motive."  *Alvarez*, 610 F.3d at 1265; *see Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d

1227, 1240 (11th Cir. 2016) ("[T]he crux of the analysis at the summary judgment

stage is whether the plaintiff has offered sufficient evidence to establish a genuine

issue of discrimination."); *cf. Reeves*, 530 U.S. at 147 ("Proof that the defendant's

explanation is unworthy of credence is simply one form of circumstantial evidence

that is probative of intentional discrimination . . . .").  Indeed, plaintiffs may defeat

a summary-judgment motion outside of the *McDonnell Douglas* framework by

presenting "a convincing mosaic" of circumstantial evidence that raises a

reasonable inference that the employer discriminated against him.    *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

When a plaintiff seeks to prove discrimination with evidence that a similarly situated employee outside his protected class was treated more favorably than he, he must show that he and the comparator are "similarly situated in all relevant respects."    *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).    In cases alleging discriminatory discipline, we consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.    *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (stating that "the quantity and quality of the comparator's misconduct must be nearly identical" to permit comparison (quotation marks omitted)).    Comparator evidence may be used to establish pretext. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276–77 (11th Cir. 2008).

Evidence of racial comments also "may provide circumstantial evidence to support an inference of discrimination."    *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998); *see Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) ("Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case.").    As relevant here, a supervisor's use of "boy" may be evidence of discriminatory animus, depending "on various factors

17

including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods*, 546 U.S. 454, 456 (2006).

Here, we assume without deciding that White established a prima facie case of race discrimination. Even if the district court correctly found that White did not produce evidence of a valid comparator, there is some evidence that he was replaced by someone outside his protected class. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984) ("[A] member of a protected class makes out a prima facie case if he establishes that he was qualified for the job, but was fired and replaced by one outside the protected class."). Specifically, White testified that a new, white manager appeared on the schedule during the same week that he was terminated.

Nevertheless, White has not provided sufficient evidence to rebut Winn Dixie's legitimate, non-discriminatory reasons for his termination. White believes that Winn Dixie concocted his PIP and his alleged performance deficiencies as a pretext to terminate him. But the record reveals long-standing performance deficiencies consistent with the PIP and Winn Dixie's reasons for termination.

White's performance reviews show fairly consistent performance deficiencies dating back to June 2010, when Sledge noted that he needed to work with his associates to improve customer service and that his fresh check could be improved. Moreover, in her declaration, Sledge stated that White failed to

18

manage, train, and supervise his staff, had poor time-management skills, and failed to inspect the dairy department for out-of-date products or coach the dairy manager as required. Another performance review in November 2010 by Bell indicated that White needed to hold department managers accountable for store conditions and their daily tasks and that the grocery department had regressed due to a lack of leadership exhibited by White and his subordinates. These earlier assessments of White's performance were entirely consistent with Leimbach's later observations that White failed to complete ads on time, to inspect for and remove out-of-date products, to supervise his staff, and to schedule staff appropriately.

While White questions the rationale behind some of Winn Dixie's decisions—like its decision to place him on a PIP despite his newness to the service-area-manager position—he cannot show pretext simply by quarreling with the wisdom or fairness of those decisions. *See Chapman*, 229 F.3d at 1030; *Elrod*, 939 F.2d at 1470. And most significantly, he did not present evidence contradicting his supervisors' broadly consistent critiques.

In fact, White's own testimony, far from rebutting Winn Dixie's non-discriminatory reasons for his termination head-on, tended to echo those reasons. *See Chapman*, 229 F.3d at 1030. His testimony that he did not complete his job duties because he did not have time was consistent with the critique that he lacked time-management skills. Similarly, White testified, consistent with Leimbach's

19

observations, that he did not (1) inspect the meat department or any other department before closing; (2) keep track of pricing issues; or (3) inspect the schedule to make sure part-time employees were scheduled correctly because other people did those jobs.  Thus, White failed to rebut the factual bases underlying Winn Dixie's legitimate, non-discriminatory reasons for his termination.

White's belief that Winn Dixie was not enforcing similar standards with other managers is insufficient to establish pretext because he presented no evidence to corroborate that belief.  *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) ("Conclusory allegations of discrimination, without more, are insufficient to raise an inference of pretext.").  Although he maintains that Miller, the assistant store director, was similarly situated but treated more favorably than he, the record fails to establish that Miller's performance deficiencies or misconduct were sufficiently similar in quantity and quality to permit comparison.  *See Stone & Webster Const., Inc.*, 684 F.3d at 1135; *Holifield*, 115 F.3d at 1562.  Leimbach testified that Miller's performance improved after he was placed on a PIP, while White's did not.  And there is no evidence, for instance, that the store failed a corporate audit the night after Miller served as MOD.

Nor can we say that White's other evidence is sufficient to create an inference that racial animus more likely than not motivated the decision to

terminate his employment.[3]  *See Alvarez*, 610 F.3d at 1265.  Of this evidence, most significant is his testimony that Leimbach twice called him "boy" during "heated exchanges."  First, on November 13, 2013, Leimbach called White "boy" when criticizing White for using his iPad at work.  Second, on December 18, 2013, Leimbach yelled at White to "get your black ass back here, boy," after White accused Leimbach of improperly denying his request for time off.  There is no question that a reasonable jury could readily infer discriminatory animus from these comments.  *See Ash*, 546 U.S. at 456; *cf. Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 896–97 (11th Cir. 2011) (manager's use of the term "boy" to refer to an African-American employee was evidence of racial animus).

Even so, in the absence of a mixed-motive theory, we cannot conclude on this particular record that a reasonable jury could find that Winn Dixie discriminated against White on the basis of race.  While Leimbach's comments are deeply offensive and inappropriate and they betray a discriminatory attitude, White has presented no other evidence of pretext, as explained above.  And we have generally held such circumstances, in and of themselves, insufficient to demonstrate pretext.  *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) ("Although a comment unrelated to a termination decision

---

[3] The record fails to support White's contention that Leimbach discriminated against him when it came to time off and scheduling.  White presented no additional evidence regarding these issues from which an inference of discrimination could be drawn.

may contribute to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext." (citation omitted)); *cf. Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1309 (11th Cir. 2007) ("Crawford erroneously argues that evidence of a discriminatory animus allows a plaintiff to establish pretext without rebutting each of the proffered reasons of the employer."). Nor was this a situation where an employee with a good employment history "suddenly began receiving poor evaluations when a new supervisor came on," *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002), such that a jury might reasonably question whether Leimbach's assessments were infected by discriminatory animus. Pietruszewski and Sledge had discussed putting White on a PIP as early as July 2013, before Leimbach became White's supervisor. And, as noted above, White's earlier supervisors observed performance deficiencies of the same type that Leimbach found and that were consistent with White's own testimony.

On this record, therefore, we conclude that no reasonable jury could choose to disbelieve Winn Dixie's non-discriminatory reasons for White's termination and instead conclude that Winn Dixie "more likely than not acted with a discriminatory motive." *See Alvarez*, 610 F.3d at 1265. We affirm the grant of summary judgment in favor of Winn Dixie on White's claims of race discrimination.

## B. Retaliation

22

"To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). If a plaintiff does so, the employer has the opportunity to articulate a legitimate, non-retaliatory reason for the adverse action. *Id.* "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Id.*

Here, we agree with the district court that White did not establish a prima facie case of retaliation. In particular, White's claim fails for lack of a causal connection. We acknowledge the close temporal proximity between White's October 2013 EEOC charge and the decision to initiate his termination in mid-November 2013. But while close temporal proximity between the employee's protected conduct and the adverse action is generally sufficient evidence of a causal connection, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

23

In this case, close temporal proximity is not enough to create a causal connection because White failed to show that either Leimbach or Pietruszewski was aware of his protected conduct. *See id.* The undisputed evidence reflects that Leimbach and Pietruszewski jointly made the decision to terminate White's employment. And both Leimbach and Pietruszewski testified that they were not aware of White's EEOC charge until after his termination. That testimony was not contradicted. Though White appears to claim that Hardy was the actual decision maker, there is likewise no evidence that Hardy was aware of the October 2013 EEOC charge. Without evidence of their knowledge of White's EEOC charge, White cannot show that Leimbach, Pietruszewski, or Hardy intended to retaliate against him for that charge. *See id.*

That Winn Dixie corporate officers, like Andrews, who investigated White's internal complaint, may have been aware of White's EEOC charge is not sufficient. *See id.* at 800. We cannot impute this knowledge to the decision makers without evidence of that circumstance. *See id.* ("[T]he fact the employer is a corporation does not relieve a plaintiff of the burden of showing a causal connection between the protected conduct and the decision to take the adverse employment action.").

For these reasons, we agree with the district court that White failed to establish a prima facie case of retaliation under Title VII or § 1981.

24

## C.  Family and Medical Leave Act

The FMLA grants an eligible employee the right to take up to twelve weeks of unpaid leave annually for several reasons, including the employee's serious health condition.  29 U.S.C. § 2612(a)(1)(D).  An employee may sue his employer if it "interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise" FMLA rights.  29 U.S.C. §§ 2615(a)(1), 2617(a); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003).  We have recognized that § 2615(a) creates two types of claims: (1) interference claims; and (2) retaliation claims. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006); *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1207 n.10 (11th Cir. 2001).

"To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA."  *Martin v. Brevard Cty. Pub. Schs.*, 543 F.3d 1261, 1266–67 (11th Cir. 2008).  The employer's motives are irrelevant to an interference claim.  *Id.*  But the right to commence FMLA leave is not absolute: "an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave."  *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010).

FMLA retaliation claims differ from interference claims in that, for retaliation claims, the employee must prove that the employer was motived by impermissible retaliatory or discriminatory animus. *Martin*, 543 F.3d at 1267–68. Absent direct evidence of retaliatory intent, we apply the *McDonnell Douglas* burden-shifting framework. *Id.* at 1268. An employee establishes a prima facie case by showing a causal connection between his protected conduct under the FMLA and an adverse action. *Krutzig*, 602 F.3d at 1234. The burden then "shifts to the employer to articulate a legitimate reason for the adverse action." *Martin*, 543 F.3d at 1268. If the employer meets its burden, the employee must show that the employer's proffered reason was pretextual. *Id.* Close temporal proximity between protected activity and an adverse action is, standing alone, generally insufficient to establish pretext. *See Hurlbert*, 439 F.3d at 1298 ("The close temporal proximity between Hurlbert's request for leave and his termination—no more than two weeks, under the broadest reading of the facts—is evidence of pretext, though probably insufficient to establish pretext by itself.").

Here, the district court did not err in granting summary judgment to Winn Dixie on White's FMLA interference and retaliation claims because the evidence, even construed in the light most favorable to White, shows that he would have been terminated regardless of his request for FMLA leave. Despite close temporal proximity between White's request for FMLA and his termination, uncontradicted

26

evidence in the record showed that Winn Dixie had made the decision to terminate his employment—for reasons that, as explained above, have not been rebutted— well before he filed the request for FMLA leave. Leimbach and Pietruszewski both testified that they began preparing for White's termination in October 2013. And Pietruszewski testified that he finalized White's termination paperwork in mid-November 2013, but he had to wait for the investigation into White's complaint to finish. Although White speculated that the termination documents were fabricated, he presented no probative evidence to support that conclusory accusation. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (stating that mere conclusions and unsupported factual allegations are legally insufficient to survive summary judgment).

Because undisputed evidence in the record demonstrates that Winn Dixie would have proceeded with White's termination regardless of his requests for FMLA leave, the district court did not err in granting summary judgment to Winn Dixie on his claims of FMLA retaliation and interference.

## D. Fair Labor Standards Act

Congress enacted the FLSA to guarantee regular or overtime compensation for all actual work or employment. *Dade County, Fla. v. Alvarez*, 124 F.3d 1380, 1384 (11th Cir. 1997). As a general rule, the FLSA provides that employees are entitled to receive overtime pay at one-and-one-half times their regular rate for all

hours worked in excess of forty per week. 29 U.S.C. § 207(a)(1). Ordinarily, an employee bringing a private action for unpaid overtime must establish two elements: (1) that he worked unpaid overtime and (2) that the employer knew or should have known of the overtime work. *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015).

The FLSA's overtime requirement is subject to exemptions, to which the employer has the burden of showing entitlement. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). As relevant here, the FLSA exempts from its overtime-pay requirements any employee employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1).

According to regulations of the U.S. Department of Labor ("DOL") interpreting this exemption, bona fide executive employees are those (1) who are compensated on a salary basis above a certain amount; (2) whose primary duty is the management of the enterprise in which the employee is employed; (3) who customarily and regularly direct the work of two or more other employees; and (4) who have the authority to hire or fire other employees or recommend a change in employment status for other employees. 29 C.F.R. § 541.100(a).

"Primary duty" is defined as the "principal, main, major or most important duty that the employee performs" and must be determined based on all of the facts in the case and the character of the employee's job as a whole. *Id.* § 541.700(a).

In evaluating an employee's "primary duty," the factors to consider include the relative importance of management duties as compared with other types of duties, the amount of time spent performing management duties, the employee's relative freedom from direct supervision, and the relationship between the employee's salary and the wages paid to other employees for the kind of non-management work performed by the employee. *Id.*

Here, the district court did not err in granting summary judgment to Winn Dixie on White's FLSA claim. To begin with, White does not address one of the two independent reasons the district court stated for granting summary judgment on the FLSA claim. In addition to finding that an exemption applied, the court found, independently and alternatively, that White failed to establish that Winn Dixie failed to pay him overtime. White's briefing is directly solely to the court's conclusion that he was an exempt employee, so he has not "convince[d] us that every stated ground for the judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). And "[w]hen an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." *Id.* Because White abandoned any challenge to the dismissal of his FLSA claim for failure to establish a prima facie case, "it follows that the judgment is due to be affirmed." *See id.*

29

In any case, we cannot conclude that the district court improperly concluded that White was an exempt executive employee based on the four criteria set forth in the DOL's regulations. *See* 29 C.F.R. § 541.100(a).

First, the parties do not dispute that White's salary exceeded the minimum threshold. Second, based on the job description, White's primary duty was the management of the store he worked in because he was required to lead, manage, and develop service and pricing options and team members. White's specific duties included acting as manager-on-duty when assigned, recruiting and hiring applicants, scheduling department team members, and ensuring adherence to wage and hour policies and regulations. White contends that the job description did not accurately describe his job duties, but there was no dispute that White acted as the manager-on-duty, conducted the hiring process through an initial interview, and supervised two customer-service leads and the cashiers. Third, as noted, White acknowledged that part of his job duties included directing the work of two customer-service leads as well as the cashiers. Finally, White confirmed that his suggestions and recommendations as to hiring new employees were given particular weight because he chose who to interview and, following an initial interview that he conducted, forwarded qualified candidates to Leimbach.

Thus, all four of the necessary criteria for the executive exemption applied to White. Although White submitted a report finding that he was not an exempt

30

employee, the report did not indicate who prepared it or how that conclusion was reached. In these circumstances, we cannot fault the district court for not considering the report as admissible evidence contradicting Winn Dixie's evidence that he was exempt.

Accordingly, the district court did not err in granting summary judgment to Winn Dixie on White's FLSA claim.

## V. Conclusion

For all of these reasons, we affirm the district court's grant of summary judgment in favor of Winn Dixie and against White.

**AFFIRMED.**